1               UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF KENTUCKY
2              CENTRAL DIVISION AT FRANKFORT

3

SAMUEL LONG,

4

     Plaintiff,

5

                        Docket No. 3:19-CV-35
6  VS.                   At Frankfort, Kentucky
                        Wednesday, July 28, 2021
7                        1:26 p.m.
BARRINGTON W. WRIGHT and
8  PLANA TRANSPORTATION, INC.,

9     Defendants.

10                   - - -
      EXCERPTED TRANSCRIPT OF JURY TRIAL PROCEEDINGS
11  BEFORE U.S. DISTRICT JUDGE GREGORY F. VAN TATENHOVE
          ***CLOSING STATEMENTS and THE VERDICT***
12               ***Day 3 of 3 Days***
                   - - -
13  APPEARANCES:

14  For the Plaintiff:  DANIELLE REESOR BLANDFORD
                       ADRIAN M. MENDIONDO
15                     Morgan & Morgan - Louisville
                     420 West Liberty Street, Suite 260
16                     Louisville, Kentucky 40402
                     (502) 912-5952
17

For the Defendants: ELIZABETH JOHNSON WINCHELL
18                     DANIEL E. MURNER
                     Landrum & Shouse, LLP - Lexington
19                     106 West Vine Street, Suite 800
                     Lexington, Kentucky 40588-951
20                     (859) 255-2424

21  Court Reporter:      SANDRA L. WILDER, RMR, CRR
                     Official Court Reporter
22                     313 John C. Watts Federal Building
                     330 West Broadway, Suite 327
23                     Frankfort, Kentucky 40601

24

      Proceedings recorded by mechanical stenography,
25   transcript produced by computer.

*[Proceedings commenced at 1:26 p.m. in open court]*

THE COURT:  All right.  You can be seated. The jury has returned to the courtroom.

Good afternoon.  We are going to turn to the closing statements of the parties, and we'll begin, I think, with Mr. Mendiondo.

And as he's approaching the podium, I do see some of you have your notebooks, and I do direct you not to take notes during closing statements.  You, of course, will have those available for your deliberations.

Counsel.

MR. MENDIONDO:  Thank you, Your Honor.  May it please the Court.

THE COURT:  Mr. Mendiondo.

MR. MENDIONDO:  Counsel.

MR. MURNER:  Mr. Mendiondo.

MR. MENDIONDO:  And, Ladies and gentlemen of the Jury.  I think Danielle told you first that we're going to say thank you a bunch of times, so thank you again for the final time or second to the last time for me.

I'm about to give you the closing argument. We're going to argue our side of the case and explain

why we think the evidence supports our position.
Again, what I say is not evidence.  It's what you've
heard from the witness, what you see from the evidence
submitted.  That's what has to guide your decision.
It's probably why you can't take notes while I'm
talking.  If I say something and you treat it the same
as something that was actually said by a witness, it's
not the same.

But I thank you for this.  After I go, the
defense counsel will go, and then I'll get a brief
rebuttal.  Someone once, when I gave a rebuttal,
actually rolled their head back and said, "Oh, God."
So I'm going to try to do a little bit better than
that, but if you would, just bear with me.  You know,
sometimes they may something, and I want to respond to
it.  So I won't take too much time, I promise, on the
rebuttal, try to get you guys moving.

Normally we start in a case like this when
I'm on the plaintiff's side and I talk about
liability.  Why I think the defendant's position that
they're not responsible for this is absurd, and how
ridiculous that they could even say such a thing in
front of you fine people.

I don't have to do that today, kind of.  The
defense has stipulated to liability.  That means

they've accepted fault, and you'll see in the jury
instructions that they agree they're at fault, and
there'll be no instruction in which you can find
whether or not they're at fault.

And yet the defense still a little bit has
tried to play it loose with that. They've kind of
stuck in some questions, some statements in evidence
trying to suggest, Yeah, we're at fault, but maybe not
really entirely hey, maybe just blame the plaintiff a
little bit. What did that sound like? Well, it
sounds like asking a trooper, Are you sure it was 25
feet? I mean, I know you got out and measured it, but
could you really prove to be where that line started
and show me the exact picture?

What about when you turn your car to the
right, can you really see the guy, even though you're
all the way in the left lane and you've got your left
blinker on? I mean, if you can't see him, is it
really your fault for running him over on his
motorcycle while he's driving straight ahead? And ask
those questions, not because they're going to
challenge fault, but because they're trying to present
little seeds of doubt that maybe you'll just discount
other things our client says. Maybe you'll just take
that against our client and you'll reduce the damages

by some amount, or you'll disbelieve something he says
when they poke at things that they've actually
admitted in open court.

So I'm not going to get any more into fault
than that or talk about how the collision happened.  I
just want to point out that fault's not at issue here.
The reason they've admitted that they're at fault is a
strategic decision.

As you heard from Mr. Wright, a year ago he
was not accepting responsibility, but coming to trial
and now being in front of you, it's more convenient
for the defendant to say, "I'm sorry."  If they say,
"I'm sorry," and they say, "I'm accepting
responsibility", they appear reasonable, and then my
client appears unreasonable.

This guy who says he's hurt but still has the
audacity to take vacations and to be hurt while on
vacation because how dare him go on a trip and try to
get back to the life he had if he's hurt.  Shouldn't
he just be sitting at home moping around?

How dare him go to work and try to do his job
and continue to run the feed mill that he's run for
the last 40 years of his life if he's hurt.  Shouldn't
he just be stuck inside on his couch?  Do hurt people
go to work?  Do hurt people go on vacation?  Can hurt

people fish?  Well, of course, they can.  Isn't that what we expect of people?  Don't we ask them to pick themselves up off the ground and go forward with their life?

The nice thing about being a defense attorney is you get to pick at it from any side you choose.

If my client came in here and said, "I just don't go anymore," he'd be faking.

If my client came in here and said, "I just can't work," he'd be exaggerating.

If my client came in here and said, "I'm just not able to fish," he's being a bit of a baby.

That's not him.  Never has been.  Never will be.  You heard lots of testimony from himself, and then also from his wife and his stepson about his demeanor, what he can do, how he acts, how he feels.  Of all the people who've testified about it, Sam -- he was on a low end as far as talking about how bad things were.  He minimized everything.  He exaggerates everything he can do -- and not exaggerate, I guess isn't really a fair word, but he sees the best of it.

If Sam can pick up a bucket and carry it 50 feet and make it 50 feet, as far as he's concerned, he can pick up a bucket just fine.  And when Theresa sees him pick up a bucket and walk 50 feet and struggle

every step of the way, she sees him struggle.

That's not a detriment to him.  That's not something wrong with him.  It should be celebrated. But when you're on the defense, you get to pick on stuff like that, and so that's what you've seen in this case.

There's no punishment in this case.  There's no bad guy.  Again, some of the stuff you're going to hear from the defense and you've heard from the defense is an attempt to see Sam look like a bad guy. How dare he come here and ask you for money, for money?  When he can still work, and he can still go on vacation, gosh, lots of vacations.  I mean, he must have gone three times a year for four straight years out of his house to Gatlinburg and to South Dakota and Florida to see his family.  You know, and he hurt, but, you know, he could still do it.  Like a bad guy. There's no bad guys here.  They're not bad guys.  No one's saying that the defense is bad guys. Irresponsible, for sure.  Running someone over with your semi truck is irresponsible.  Switching into the left lane with your left turn signal on and making a right turn from the left lane, that's irresponsible. It's not a bad guy.  It doesn't mean he gets punished. He doesn't get sent to jail.  He should be held

1 responsible for the consequences.

2      There's two people in this room, one who
3 caused the incident and the injuries, and one who's
4 burying the consequences.  Today the only person who's
5 borne responsibility for what the defendants did is
6 Sam 'cause he's living with it every single day.  He
7 didn't ask for that.  He doesn't want to be here.

8      The reason we're here is to try to find a
9 remedy for the consequences that he's had to bear for
10 the things that have been thrust upon him in his life,
11 through no fault of his own because he was doing his
12 friend a favor and helping him safely get a bike home.

13      Now, the law doesn't give us all the remedies
14 that we might want in a case.  You know, our client,
15 when he comes to us, he doesn't say, Hey, listen, what
16 I really want you to do is go to court and just prove
17 I'm right.  That's enough.  They just say they're
18 sorry, I'll be fine.  I'll live with this for the rest
19 of my life.  That's not fair, right?  That's not
20 justice.

21      But he's not asking for punishment, and the
22 law doesn't allow that.  That would be barbaric.  I'm
23 not going to go out and run over Mr. Wright.  I'm not
24 going to tear his rotator cuff and cause burns down
25 his legs.  We're not here for retribution.  That's

barbaric, right?  That's unjust.

Unfortunately, we can't fix it.  If there were two courts, this court and on the other side of the road instead of a state court maybe there was the Court of Miraculous Healing, the one that Sam could walk into, and if he could just show you that these injuries were caused by someone else's fault, he could be better, he could be whole.  Take away the pain, give you back those last four years, make everything right, just like it was, didn't happen.  We'd be in that court.  Sam would have picked that court.  He can't.  It doesn't exist.  All we've got is this one. And in this court, the only thing available to Sam is a remedy, is money damages.  The Judge will instruct you on that.  Judge Van Tatenhove will read the instructions to the jury, and that will contain the law that you're to apply.  And what that will say is that when you deliberate on this case, you are required to award the plaintiff the amount of money that will reasonably and fairly compensate him for any injury you find was caused by the defendant.  That's the remedy the law allows.  And there's dignity in that remedy.  There's justice in that remedy.  It says, "We can't give you this.  We can't make you whole, but let's try to find something that's

available that's an equivalent."  And that's what we
do in this courtroom; we look for that equivalency.

When you go back into the jury room, you get
to do this however you want.  The only instruction you
get is, Ladies and gentlemen, you got to pick a
foreperson, you got to look at the evidence, and
you're instructed how to look at the evidence, and you
got to fill out this form.  Other than that, how you
go about this is up to you.  Nevertheless, I'm a
lawyer, I like to tell people what to do, and I'm
going to suggest to you a way to deliberate in this
case, kind of a process to go through.

The first thing that I'd ask you to do to
deliberate on, the first question to ask yourselves,
maybe the foreperson can raise it up, is what injuries
are related to the collision in this case?  What
injuries were caused by Sam getting run over by that
truck?  Some of those are going to be easy, right?
The burn?  Obviously, nobody's disputing it.  The road
rash, related.  The hip hematoma, that big football
that's sittin' on the sides of his leg, done.
Bruising down his legs, that big black-and-blue thing
that went down his leg for several weeks, slowly
healed.  Sure.  The ankle pain, Dr. Lyon conceded
ankle pain.  That's there.  That's going to be there

forever.  Okay.  That's related.  Swelling in the leg.
Sure.  It took a little while, but he got there.  By
the end of his testimony, he conceded.  That, too, is
related.

The hip.  Here's our dispute, right?  There's
the one that most of the medical testimony you've
heard is fighting over.  There's when you see the
proof and what we've agreed to for medicals and what
we haven't, and that's going to be the fight.  I want
to talk about that hip.  I want to talk to you briefly
about the Judge's instructions, how Your Honor Judge
Van Tatenhove is going to instruct you at the end of
this case.  There's magical words I have to say before
I read these.  I'll get 'em wrong, but I think it's,
Ladies and gentlemen, in a few moments, Judge Van
Tatenhove is going to instruct you on the law as it
applies to this case, and I'm going to read to you a
portion from those instructions.

Defendants have stipulated to liability for
causing the accident.  And now you must determine the
amount of money that will fairly compensate plaintiff
for any injury that you found he sustained and is
reasonably certain to sustain in the future, past and
future, as a directed result -- sorry -- as a direct
result of defendant's conduct.

1    Your award shall include compensation for
2  losses attributable or related to his pre-existing
3  physical condition, but only if and to the extent that
4  such pre-existing physical condition was aroused or
5  aggravated by the accident in question.  Plaintiff
6  must prove his damages by a preponderance of the
7  evidence.

8    At the very beginning of the case, the Judge
9  in jury selection talked to you about those scales of
10  justice, the preponderance of the evidence.

11    So this is not a criminal case.  We don't
12  have to prove our case beyond a reasonable doubt, but
13  we do have to tip the scales in our favor so that it's
14  more likely than not that what we have presented is
15  the truth.

16    If you find it's more likely than not that --
17  and more likely than not, that Sam's arthritis in his
18  right hip was aggravated or aroused by the collision,
19  then it's related legally, and he's entitled to full
20  and fair compensation for that injury.

21    If you don't, it is not, and we're simply
22  talking about the rest.  But I want to talk to you
23  about that hip and the evidence.

24    Before I get into the hip, I want to talk
25  just briefly about Dr. Lyon.  I don't know if you

recall during opening you were told by the defense
that, you know, they had to hire Dr. Lyon because the
plaintiff's got a treating physician, and they're not
allowed to talk to the plaintiff's treating physician.
They can't know what he's going to say.  So they got
to go out and hire their own doctor.  And this
independent doctor is going to make his own
assessment.  And that's really all he's there for, is
just because they can't talk to the defense -- or to
the plaintiff's doctor.

          And yet, I don't know if you recall, but the
very first thing that the defense did when they came
to cross-examine -- Mr. Murner got up here to
cross-examine Dr. Clegg, is he walks over and hands
him a transcript, that a stack of papers.  It's
described as a deposition.  That transcript is a
written recording by a court reporter, just like we
have here in this courtroom, where she wrote down
everything that was said in that deposition, a
deposition where defense counsel sat across the table
or via a Zoom video and asked Dr. Clegg questions
under oath about everything he thought about this case
and what his opinions were and what he thought was
related and what treatment he needed, and everything
else.

In every case, every party has the opportunity to question any witness in just that manner. You don't hire your own doctor because you don't know what the treating physician's opinions are. You hire your own doctor because you don't like 'em. And that's what happened in this case. And they want you to congratulate them for it.

Guys, we could have hired two. We could have hired Dr. Lyon and looked at his opinions and said, ah, he's still giving them a little bit too much, thrown that one out and gotten a third.

Look, they're entitled to bring a doctor here and present their side of the case, but not pretend he's independent. There's no such thing as an independent witness in a case. Every witness has some interest. Dr. Clegg's interest is in seeing Sam get the best treatment he can. He's his treating physician. He's making his whole.

Dr. Lyon's interest, he makes $675,000 a year doing 300 independent medical examinations each year, and that's only 15 percent of his practice. But hey, let's talk about the opinions that got Dr. Lyon here and helped him make that $675,000 this year.

What do we know about the hip? What do we know for sure that's not in dispute? Before the

wreck, Sam had no pain in his hip, not in his right,

not his left, nothing.  Not one record suggests he had

any pain in either side of his hip.

Before the wreck, Sam had arthritic

conditions in both sides of his hips, pre-arthritis,

the kinds of things that could cause pain but don't,

unless they get worse, or something causes them to.

The X-ray that was taken the very day of the

collision showed just that.  Dr. Clegg and Dr. Lyon

said, Yeah, on both sides he's got these problems that

could, you know, one day come to fruition, but it's

certainly not hurting him now.  And they could not

have just occurred.  They had to have been there long

before.

He has a collision.  Sometimes the defense

says, "He fell on his bike."  No, he got hit by a semi

truck, slammed to the ground, dragged 56 feet, has

enormous bruising, and this hematoma, this football

that's sittin' on the side of his leg, that's how bad

it was swelled.

For six months his hip slowly improves, as do

his other injuries, and he gets better.  After the six

months, he's discharged from physical therapy.  He's

ready to go on with his life.  How whole he was,

that -- that remains in question.  Sam wanted to be as

good -- he wanted to be better.  He tried to be better.

Eric testified, you know, he wasn't nearly as better as he wanted to say he was.  I get that.  Sam doesn't want to be hurt.  But regardless, he's definitely doing better than he was at the time of the collision, and he's back at home and he's discharged and he starts trying to do some work.  Six months after that, he's back at the doctor talking about hip pain.

Now, one interesting thing you can hear.  You know what doctor's trying to sort of twist the story a little bit when a patient complains about pain, and the doctor looks at the record and says he first complains.  He first experiences.  This is the first time he's had this pain.  As if a person goes to the doctor the very day they wake up and someone hurts just a little bit, particularly Sam, who you've heard him testify doesn't even want to go to the doctor at all, if he can help it.

But a year after the collision, he gets to the doctor for pain that did not just start but is now to the point that he needs to be seen.  And that pain has since gotten worse and worse, and both Dr. Lyon and Dr. Clegg agree, he needs a total hip replacement.

1    This is the only drawing I'm going to do, but
2 I want to draw this out because I think it's helpful
3 to think about this visually.  Okay?

4    If I have a graph, I put a point here.  This
5 is the day Sam gets hurt.  A point here.  About six
6 months later, okay, where he's released from physical
7 therapy.  And a point here when he's back at the
8 doctor.

9    The evidence you've heard generally is that
10 starting here at the very beginning, Sam has always
11 had arthritis in his left hip, and that arthritis has
12 never caused him any problem.  Sam has always -- I'm
13 sorry, starting out had arthritis in his right hip.
14 That arthritis got worse.  On this day, they were the
15 same.

16    On the other side, he has this injury.  The
17 injury starts out terribly, but gets better.  I missed
18 my point here, but as the injury goes down, Sam's
19 discharged from care while his arthritis is going up
20 until here when he goes to see the doctor.

21    Dr. Lyon, for $675,000, wants you to think
22 this is all a big coincidence.  It just happened.
23 They're unrelated.  But what Dr. Clegg has said is
24 that those lines have a direct correlation to each
25 other.  When Sam got hit and his body got injured, it

had to heal.  And as his body healed, it caused
changes to the internal structure of his body,
swelling came, blood flow came.  I'm going to get this
wrong.  I think it was -- the word was cortical
modeling changed and exacerbated the arthritis in his
body.  As that top line went down, the bottom line
went up, and that's why it went up only on the right
side.  He didn't get jolted into having arthritis.
That's not how it happens.  But a year after this
collision what started as two identical hips ended as
one hip that was about five to ten years advanced, at
best, from the other.  One had arthritis so bad he now
can't walk.  The other is still just fine.

          Lyon.  Sure, he had the same condition, sure,
the right hip was the only that was one bruised, sure,
the healing process can result in that change, he
acknowledged that during it, but you just can't be
sure.  And so Lyon will tell you it's a big
coincidence.

          Dr. Clegg, looking at the X-ray evidence, at
the X-rays, at the worsening, he says you can't write
that off.  More likely than not, the hip, the current
condition was brought into disabling reality, it was
aggravated.  It was -- for the word here from the jury
instructions -- aroused by the collision.

I also want to talk about the shoulder. I talk about that after the hip because I think it's significant.

You know, the shoulder injury and the hip injury from the medical record perspective aren't really that different. The shoulder, like the hip, Sam thought was better six months after the collision. The shoulder, like the hip, had no complaints until it started to hurt again. The shoulder, like the hip, has a condition that Dr. Lyon said could have pre-dated the collision, but was clearly exacerbated by the wreck. The shoulder's just a lot less complicated.

When you're a doctor trying to explain to a jury why you should only give half credit for the injuries, the shoulder's a lot easier to swallow.

The shoulder's credibility. It's a chance to say, well, yeah, this is related, but not this. But medically there's no difference.

The reason the shoulder is related by Dr. Lyon is because he had no complaints before, he had immediate complaints after, there is a condition that's causing the pain, and there's no other logical explanation. That is the exact same thing to be said about the hip.

And when you're answering the question of
what is related, I want you to recall that the
instruction is going to be that preponderance of the
evidence.  Preponderance of the evidence is a question
for all findings of fact that you must make as this
jury.

When they're talking about monetary damages
and plaintiffs are accused of being unreasonable and
asking for money, defense attorneys like to imply that
there's something wrong with recovering money.  And
the truth of the matter is, when it comes to awarding
money, juries often stretch that burden a little more
maybe than the law requires.  They don't want to make
that monetary award unless there's a little bit more
than a preponderance of the evidence.

What I would tell you is, if you were the
Court of Miraculous Recovery, if you, ladies and
gentlemen, could decide what's going to be healed and
what's not, and the standard was simply the
preponderance of the evidence, when you think about it
that way, that's the same way to think about
preponderance of the evidence when it comes to
awarding monetary damages when you decide what's
related.  It's not related or not because of what the
consequence is.  It's related or not because of

whether or not the evidence supports it. So that's
the first question, what's related?

I talked for a while. I promise I'm going to
get through these next things a little bit quicker.

The second question I want you all to think
about -- I suggest you think about when you're trying
to determine what the remedy is in this case, is what
if it was only? What do I mean by that? What if it
was only one injury and not all the injuries, and
think about each of them? What if it was only the
wreck?

Can we publish the wreck pictures for the
jury.

I know you can see it when that TV goes up.
Okay. What if this was the only injury we're talking
about? If Sam had been riding his motorcycle, hit by
this truck, dragged for 56 feet, thought he was going
to die, maybe laid on the ground dazed and stunned for
15 minutes, but got up and was just fine, would he
still be entitled to recover? Would that harrowing
experience -- what is the value of that harrowing
experience. The law says yes. What if it was only
that?

What if it was only the cuts, the scrapes,
the bruising, the road burns on the outside? What if

it was just the physical pain of being dragged and

suffering, just -- just the drag itself.  Nothing's on

top of him, he's just being pulled along the pavement

for 56 feet, and so he recovers in, I don't know,

three months, four months from all of those scrapes,

bruises and burns.  What is the value of that?

What if it was only the burns?  These two

wounds that are described in the medical records

you've heard about that had to be debrided.  That 12

by 5 centimeter, approximately three to four

millimeter in depth granulated base with overlying

adherent exigent with yellow with serious drainage,

and on and on that we don't have pictures of, thank

gosh.  What if it was just that, what is the value of

living with those burns for six months while they get

worse and then get better, and you have to go and have

the dead tissue scraped off?  And, Oh, don't worry

about it, Hey, you've got lidocaine.  That's fine.

I'm sure it didn't hurt the rest of the time.  What if

it was only that injury?

What if it was only the deep bruising and the

hematoma, soft tissue, but deep soft tissue that --

the injuries that -- of the leg where it turned black

all the way from the hip down to the ankle.

If we could go to the next one.  The

hematoma, I think, is really significant.

It's hard when you first look at this picture to realize what we're looking at 'cause I thought Sam was sideways and I was looking at a picture of his rear-end while it was sticking out right there.

But no, this is -- he's looking head-on here. This is how much the bruise sticks out, how deep it was on the side of his body. What if it was just that one that took months to go away, and the pain associated with it?

What if it was just the ankle being crushed requiring months of rehabilitation for being pinned underneath the bike, and the ongoing swelling and pain that the doctors have said he's going to live with for the rest of his life, that permanent injury? Everything else was fine, but it was just the ankle, and that was the only thing we were talking about today. What if it was only that?

What if it was only the shoulder tear that he's been living with for four years now and on which he's going to have to have a surgery where they're going to cut him open and remove his bicep, put it back, and sew these things together. Wrong side. What if it was just that injury and the physical therapy and the recovery he had to do after that?

What if it was just the hip?  What if it was just the leg swelling that's never going to go away?  Where every day from now and the rest of his life he's going to wake up every morning and have to ask himself the same question, Do I deal with the pain from the swelling, or do I put on this sock?  "Sock's" a really nice word for this torture device that squeezes his leg all day long and so it doesn't swell, but it hurts even worse.  What if it was just having to suffer through that every day for the rest of his life?

And then when you ask yourself what if it was only, I'd like you to talk about, what does it mean to be permanent?  Permanent injuries are a really hard thing to understand today because we don't live in the future.  We live in the now.

Well, what does it mean for an injury to be permanent?  If Sam wakes up in 20 years and his leg still hurts, when it still hurts and he wants to put that sock on, and it's worse than it was today and it's worse than it's ever been, Sam can't come back to this jury and say, Please help me, award more money, you don't know how it's going to get.  An injury -- an award today, a verdict today is a verdict for all time.  This is it.  When Sam wakes up in 20 years and puts on that sock, the award he gets today has to

compensate him for today, for that day 20 years from now, and for every single day from here until then.

You heard his wife talk about the effect of this pain and this injury on his demeanor. Permanent injuries have that effect on people. For example, think about a guy who wakes up in his bed, neck hurts a little bit; he's got a crick in the neck, slept the wrong way. Goes to work that day. Neck hurts, turns, you know, try to look in the rear-view mirror. The guy can't look in the rear-view mirror. It's painful, but it's fine. He's going to be okay. Goes to work, a little annoyed, somebody talks to him, "How's it going? Ah, not that great, a crick in the neck, but fine. I'll deal with it."

Goes home, talks to his wife, still hurts. I don't really love it. Goes to bed.

Wakes up the next day, ah, still hurts. Still hurts. Wakes up, "Honey, how's it going?" "Ah, I don't know. I still got that crick right there in my neck, it still hurts, but, ah, I'll deal with it." "Maybe you should go to the doctor." "I don't want to go to the doctor. I'm going to just go, you know, eat breakfast, go through my day, drive, same traffic light, looks again, hurts a little bit, keeps going." Goes back to work. Secretary comes in -- assistant

walks in, "Oh, can I help you with something?"  Snaps
a little bit, maybe a little grumpy, grouchy, 'cause,
you know, two days in a row dealing with this stinks.
Not the best day.  Maybe leaves work being a little
grumpy about it.  Goes to bed.  "Honey, maybe you
should do something."  "You know, maybe I will do
something.  I think -- I want to talk about this with
somebody.  If it still hurts tomorrow, we'll see."

Wakes up the next day, the neck doesn't hurt.
Hallelujah, it's better.  A permanent injury doesn't
have "Hallelujah."  It doesn't ever go away.  It gets
worse and more aggravating and more frustrating every
single day of a person's life, of Sam's life.  The
worst for Sam is he thought he had Hallelujah.  He was
there.  He got back.  He got discharged from physical
therapy and he thought he was on the mend.  He was
ready to go on with his life.  But he doesn't.  For
Sam, this injury is permanent.

And so you've asked, What's related?  What if
it was only, what does it mean to Sam for this injury
to be permanent?

How do you place a value?  Well, it starts
with the medical bills.  That's easy enough.  If we
could pull up the medical bill summary.

We've introduced these as an exhibit in the

case; I can't even remember the number, but what we've done on this is we've written -- there's two types of bills. There's the ones that everyone agrees are related, and then there's a one-line item that's not -- or two.

The only line items that aren't related are bills from Aptiva Health after 2017. That's after his initial discharge related to his hip that obviously the defense disagrees. And if you find that the hip's related, we submit that those bills are related. If you find it's not, they're not.

The others are the medical supplies. And the defense does not agree that the medical supplies that Sam purchased for himself are related to the collision or that they should have to be responsible for those.

So the difference between those -- really the only difference, and you can even make a judgment on because the 31,000 has already been determined for you, is whether it's 31, 35, or somewhere in the middle.

If we go to the next slide, the futures. You've heard Caryn Nicol, the doctor -- or, sorry, the nurse testify about future medical expenses and what she had. And I'm not going to belabor this. I want to point out a couple things 'cause I think she gave

you a pretty good idea.  Can we go to the next page?

I don't know if you recall, but the defense did a great job of talking through that with Caryn Nicol.  And she explained on the stand that, Yeah, she is not sure that that's going to be needed, those physical therapy treatments, the therapeutic treatment there for physical therapy.  In the future those are for if these problems exacerbate, but there's no certainty that he's going to need physical therapy in the future after he has these surgeries and gets repaired.

So the physical therapy visits for these inflammations that may happen in the future, defense moved and we agreed, those have to come out.  So that's been removed.

When you get your jury instructions, the jury instructions will have a lower number.  That $125,000 total maximum award that can be awarded for future medical expenses, that's going to be $7,516 lower.  We did the math earlier.  I'm not going to do it again because I can't, but it's there.

So you've got the medical expenses, but what about the rest?  What about the pain and suffering?  What about the injuries that the Judge is going to instruct you that -- Judge Van Tatenhove, when he

reads the instructions in a few moments will instruct
you as the law you're required to apply to this case.
These include the physical and mental aspects of the
injury, the mental and emotional pain and suffering or
disability or loss of a normal life.  That's what pain
and suffering is.  It includes all of those together,
both in the past and in the future.

It's the difference outside the medical bills
from what Sam was before the collision and what he
should be today and what he's not because of the
irresponsible conduct of the defendant.  How do you
place a value on that?  How do you place a value on
health, right?  I mean, on the one hand, you can't
place a value on health.  On the other hand, you have
to.

And to that, I'd ask you to think again about
the remedy that's not available to Sam and the
difference between that remedy and the one you can
award.  This wonderful Court of Miraculous Healing,
the one Sam would like to have to simply be better.

When we talked about value in all things, we
talk about essentially -- economic value anyways --
the amount a willing person is willing to pay for
something, how much they'd be willing to give for that
thing, or accept to give up that thing.  That's what

1  value is.

2        Value in this case, if you think about that,

3  the remedy Sam wants that we wish he could have is to

4  be made 100 percent medically physically whole.  None

5  of this happened.  He never had to go through any of

6  it, and he'll never have to go through any of it

7  again.  That's the remedy he'd like.

8        I submit that fair value is an amount that

9  makes that exchange equal.  That's why when we talked

10 about this case at the beginning, we told you that

11 $1.5 million in pain and suffering wasn't going to be

12 enough.  Because when you look at each of the injuries

13 that Sam has suffered as a result of the defendant

14 irresponsibly taking a right turn when he was going

15 left in the left turn lane and dragging Sam for 56

16 feet, and everything he's had to go through since this

17 collision started and everything he's going to have to

18 go through for the rest of his life, the value of that

19 exceeds the maximum damages that you can award in this

20 case.

21       Ladies and gentlemen, I appreciate your time.

22 Sorry, I hope I didn't put anybody to sleep too much.

23 I'm going to again come back in a few moments and talk

24 to you after the defense has had to go.  But we do

25 sincerely appreciate your time, and we do trust and

respect your judgment in this case, and we appreciate
you giving us that, and whatever value you place on
this case.  We thank you for your time.

THE COURT:  Mr. Murner.

MR. MURNER:  Thank you, Your Honor.  May it
please the Court.

THE COURT:  Mr. Murner.

MR. MURNER:  Mr. Mendiondo.  Good afternoon,
Ladies and Gentlemen.

Again, my name is Dan Murner.  Beth Winchell
and I were privileged to defend those gentlemen
sitting over there today, and we thank you, like
everyone else has, for your time, your patience, your
understanding.

There were times I know, and we'll get to
that, when I was trudging through Dr. Clegg.  I know
that was tough, but there's a reason for that.  And we
had to -- we had to go through that, and I'll explain
that for you in a little bit, but I really want to
thank you for being here.

I don't speak -- Mr. Mendiondo has this
talent for getting everything out quickly and
enunciating perfectly.  I don't speak that well and
that fast, so it may plod along a little here, but
I've got -- it's the slow and steady, okay?  I've got

to get these points out, so please listen to me.  I'll
try to keep this as brief as possible.

You've heard obviously that we've accepted
liability.  You've heard that we accepted
responsibility for the damages, those damages that
were solely relating to the injuries caused by the
accident.  That's what we've done.  However, it seems
like no good deed goes unpunished.  Our motives have
been impugned for doing that.

Now, if I came up here and I was denying
liability and we were arguing the liability case, I'd
be the devil incarnate to plaintiff's counsel.  So
there's no winning here from our side.

However, we assessed this case and said,
"We've caused this accident.  We are responsible.
Let's pay for those damages we caused."  However, the
law, the law only says that we pay for those damages
that were caused by us.

Counsel wants to capitalize -- Mr. Long's
counsel wants to capitalize on our acceptance of
liability, as if this is a vulnerability on our part.
We're vulnerable here because we've said, "Jury, we
caused this accident."  They want to take advantage of
that vulnerability.  We've accepted liability.  I
cannot and will not on behalf of my clients accept

1 that attack on us.

2          This is a disagreement, plain and simple, for

3 what is owed.  We go on with all our exhibits, with

4 all our talk.  It's just over what is owed.  You've

5 been joined, kicking and screaming maybe, or

6 willingly, but you've been joined into this

7 disagreement, and now we're going to put it in your

8 hands.

9          The Court will instruct you and you must

10 follow those instructions on the law about what the

11 law you're going to use to -- to assess the damages in

12 this case.

13          Beth Winchell emphasized at the beginning of

14 her case -- of our case in her opening that the law

15 says that a wrongdoer pays for those damages that are

16 solely a result of the injuries from the wrong.  That

17 makes sense.  To do otherwise would be unjust.

18          However, we believe and we submit to you, and

19 you will see an example -- I think you have seen

20 examples of this in this case -- that plaintiffs have

21 pushed that envelope.  I should change that.  I'm

22 sorry.  Mr. Long's counsel are pushing that envelope

23 before you, okay?  They're pushing that envelope, and

24 they pushed it beyond credibility.  And that's where

25 we got to step in and say, Wait a minute, give my

clients a fair chance here.  You've got to look at the
evidence.

Let me give you some examples of how they
pushed the envelope.  The first one came right off the
bat in Ms. Blandford's opening statement.  She said,
"Sam Long is a good ol' Kentucky boy.  Loves outdoors,
but hunting and fishing have been taken away from him
by this accident."

Well, we know from his testimony he doesn't
hunt, and we know from his testimony that he's been
able to fish.  That's one example.

Now, if we could go on the slide -- and if we
could publish to the jury.

Another example, you remember we were accused
of picking and choosing those damages we wanted to
pay, that we were somehow ignoring damages that --
that Mr. Long is claiming, as if we had to accept
those damages without question.  And we just simply
say, "We caused the accident.  We accept whatever you
say."  You've learned that that's not actual --
actually the truth here.

Ms. Blandford, when we discussed with
Dr. Clegg in August 14, 2017, physical therapy
record -- that's on slide 2 there -- or the slide
there for you -- she accused me of picking and

choosing one portion of this record and showing it to you and saying that this is how it is.

However, she put up this initial evaluation slide -- this initial examination slide and suggested with Dr. Clegg that this physical therapy for August 14, 2017, was for treatment of the hip pain, the osteoarthritic hip pain.  It was not; it absolutely was not.  That was her suggestion with Dr. Clegg.  That was incorrect, and that's what we're here -- that's an example of what we're here to correct for you.  So you have accurate, truthful information before you to assess these things.

If you look at this record, in the history of present illness, the -- where Mr. Long goes in there and discusses what's wrong, he -- he says that he was referred for neck pain, right rotator cuff pain, right hip pain, and left ankle pain.  That's the only place in this record that right hip pain is mentioned.

Okay.  If you go next, his primary concern, chief complaint, neck and right shoulder pain.

Next.  Objective part.  This is the examination.  They were looking at his scapula, his shoulders, his spinal column, his cervical spinal column.  They're looking at his right ankle, and they -- they looked at that wound on his right ankle.

Next, please.  Then what was the examination about?  The examination was the range of motion for the shoulder.  All these things related to the shoulder.

And then we went to the ankle, okay?

Next.  Strength testing.  They did the right supraspinatus; that's up in the shoulder, and they said the rotator cuff was in full limits.  He had ankle pain, okay?

Next, please.  Comments, positive tenderness, deep palpation, right upper trapz, so when they touch him, it hurts, and he's tender along the ligaments of the right ankle.

Next.  The diagnosis.  Symptoms consistent with right partial thickness supraspinatus tear; that's the right rotator cuff tear, and medial ankle sprain.  Nowhere else is the hip mentioned.  But Ms. Blandford and Dr. Clegg wanted to talk about this as if this was physical therapy for that hip in August 2017.  It was not.

This shows you -- well, what did we put up for you?  We then put up the physical therapy daily note.  This is after the assessment, after the initial evaluation is done, the physical therapists say, Here's what we suggest.  Here's what we recommend.

And again, there is no mention in there of any hip
pain, okay?  This is simply the shoulder and the
ankle.  This shows you that hip pain, when you see hip
pain in those records that you're going to get, when
you see hip pain in those time -- in that time period
between February 2018, and up back to the accident,
any mention of hip pain, they're talking about the
soft tissue pain on the right side, the bruising and
the swelling there.  That's what they're talking --
and the skin, the rash, the burning.  That's what
they're talking about.  They're not talking about
orthopedic hip pain.  And that's why we had to go into
that bony orthopedic discussion versus soft tissue
discussion.

This is also proof that we are not picking
and choosing.  We gave you the record that showed the
full picture, not picking and choosing and trying to
talk to Dr. Clegg about this record as if it's some
sort of physical therapy record related to
osteoarthritis at that time.  It wasn't.

That being said, you're here to settle two
disputes essentially, break it down simply:  What was
solely the result of this accident, and two, the
proportionality of the claims related to the accident.

The proportionality, what do I mean?  Is it

reasonable?  Are the claims reasonable?  Are they
related, or are they reasonable when you look at the
other evidence of Mr. Long's life, of Mr. Long's
treatment, of Mr. Long's recovery?  This is an honest
discussion we're going to have and we've had over the
last three days.

That does not mean -- just because we're up
here having this discussion with you, that does not
mean that we don't believe Mr. Long was hurt.  We
never said that, and we will never say that.  He was
hurt; we agree.

I mean, it's interesting that all the
agreement we have in this case, it's like maybe we
should ask the court administrator to reduce your pay
because you're gettin' so much stuff from us.  We all
agree to everything here.

But there are those things we do disagree
with.  That hip, the osteoarthritis is not related to
this accident.  So you need to look at causation and
the proportionality.  What caused that hip pain
essentially, and the reasonableness of their claims,
their $1.5 million in pain and suffering.

Again, we're not saying he's not hurt.  We're
not saying that his life hasn't changed.  It has.  It
absolutely has, and he has taken advantage of the fact

that he -- he can -- he can change his life and he
can -- and he can go out there and make the best of
things.  And he has done that.  We applaud him for
doing that.  We're not criticizing him for taking
these trips or going here or there, no, for fishing,
no, absolutely not.  That's never been said.  But we
are trying to keep the focus of this case on the
injuries and the damages.

Mr. Long's counsel are intent on presenting
you a picture of Mr. Long's life after this motor
vehicle accident that is not consistent with the
wreck, and that's what we're here to discuss,
consistency with the evidence that you're going to
have to look at.

The medical records say that this accident,
although it was painful and caused him pain, caused
him to change his life, it has not taken everything
away from him.

Sam's a poor historian; he is.  You saw up
here that he couldn't recall various dates, time
periods and such, and now he's looking back in a
historical perspective at his injuries, and he's got
new pain from aging, from osteoarthritis, and he's
relating that to that accident.  But that is not what
the records say.  That is not what his treatment

shows.  That's why we had to put before you all those
records, all those records of his treatment, of his
progression, how he was doing.  I know it was tedious.
I apologize for the time I took getting those records
before you.  I can't talk about them today unless we
get them into evidence.  That's a rule.  I can't just
simply tell you there's a record out there.  I've got
to put it into evidence, so I had to walk through
those.

        I agree, it could have been done smoother.  I
apologize for that, but I do not apologize for putting
that before you.  Those were absolutely essential to
your work today, absolutely essential, and I ask that
you take a serious look at those records that we've
discussed.  We're going to discuss them again quickly
here.

        To help review these records, we've put
together a timeline for you, okay.  If we could --
thank you.

        We start with the date of the accident.  And
I don't know if Mr. Mendiondo mentioned, but today is
July 28, and this accident happened on July 28.  It's
interesting, but he went to University of Louisville
on that date, okay?  They examined him.  This -- the
part we highlighted, "Able to leg roll at the knee

without issue.  Mild right hip ecchymosis."

The leg roll.  Remember, Dr. Clegg and
Dr. Lyon both talked about the leg roll being an
important orthopedic test.  That shows you that
there's no pain in that because he's able to turn that
leg outward, and that's an important test for checking
if there's pain in the hip.  There was none.  He was
able to -- we'll go to the next slide, please, Beth.
Thank you.  Oop.

MS. WINCHELL:  Sorry.

MR. MURNER:  One more.  There we go.

Diagnosis:  No acute fracture or
malalignment, malalignment meaning everything's where
it's supposed to be.  No fracture, we obviously know
what that means, of the right hip.

He walks out of the hospital that day and
they tell him, Go to your primary care physician.
Now, we know from his testimony that PCM, I think it
was, or -- yeah, PMC, those folks were the local
primary care physicians in this area.  But he does not
go -- next slide, please.  He does not go there.  At
the direction of his counsel, he goes to Integrated
Medical Solutions, the counsel -- or the doctors that
do work for Morgan & Morgan --

MR. MENDIONDO:   Approach, Your Honor?

1          [CONFERENCE AT THE BENCH]

2          MR. MENDIONDO:  He did not work for Morgan &

3    Morgan.

4          MR. MURNER:  Dr. Clegg testified that he did

5    work for Morgan & Morgan. Dr. Clegg, through Aptiva

6    through Integrated does work for Morgan & Morgan.

7          MR. MENDIONDO:  Absolutely, he did not say

8    that at all.

9          MR. MURNER:  That's what he said.

10          MR. MENDIONDO:  He's suggesting that -- I

11    don't even know how to respond.

12          MR. MURNER:  They sent him to -- they sent

13    him to this doctor.  He's doing the work for them.

14          MR. MENDIONDO:  That's a gross exaggeration

15    of the doctor.  He didn't do work there at the time.

16          MR. MURNER:  This doctor at Aptiva.

17          MR. MENDIONDO:  That's a huge stretch and

18    completely inappropriate.  It's not supported by the

19    evidence.

20          THE COURT:  Well, here's --

21          MR. MURNER:  They do.  They do work for

22    Morgan & Morgan, and that was -- that's absolutely

23    true.

24          THE COURT:  Well, what either of you say in

25    closing statements is not evidence.  You'll get a

chance in rebuttal to refute that.  He's not an
employee of the law firm.  I don't know what the
impression the defense is trying to --

MR. MENDIONDO:  I know what he's trying to
do.

THE COURT:  You can draw -- hold on.  Hold
on.  You can draw the jury's attention to the fact,
you know, you don't think there's any record that
supports that statement.

[IN OPEN COURT]

THE COURT:  You can continue, Mr. Murner.

MR. MURNER:  Thank you, Your Honor.

So instead of going to his primary care
physician, he goes to Integrated Medical.  And this is
the first record we have from Integrated Medical.
There's right hip pain, associated hematoma.  Okay.
So whenever you see that right hip pain in these early
stages from August, September, through February 2018,
it's going to be associated with the hematoma.  That's
what we're talking about.

What are the complaints?  The patient reports
neck, right shoulder, right ankle pain continuing
since the event, right hip hematoma, which is quite
large as well.  It's not -- he doesn't put that in
with the other pain or the other orthopedic pain.

It's the hematoma that he's talking about there.

The next record we have from Integrated Medical Solutions is August 2, 2017. We're talking about degenerative arthrosis as we talked about Dr. Clegg and Dr. Lyon. That's arthritis, and that's in the joint, as we said, the ball and the socket. There's wearing going on in there. That absolutely, there's no question about that, did not exist -- let me restate that. That arthritis was not caused by this accident. That's absolutely clear. That was not caused by that accident. It had to pre-date this accident to be there, okay? Because it takes years to develop, okay? It's degenerative, and that's why both doctors agreed that that was degenerative arthritis.

And then we had the trochanteric bursitis that we talked about. That is the outer part of the bone. That's not an arthritic issue we're talking about here.

Next, please. Then on August 4, he goes to Dr. Grau, an Board certified orthopedic surgeon at Integrated. Dr. Grau says he had mild arthritis, and he discussed with him that most of his injuries are soft tissue. Again, mild arthritis.

There was the discussion with Dr. Clegg about the extent of the arthritis. You'll -- you've heard

that Dr. Clegg is the only one who thought this
arthritis became significantly worse.  All the others
who have looked at this arthritis said from this point
to the point when Dr. Clegg sees him, it's still mild
arthritis.

Next, please.  Here's Dr. Lyon's testimony.
But before we start, let's talk about Dr. Lyon.  They
are suggesting that Dr. Lyon is going to say whatever
we pay him to say.  If that's the case, we need a
refund.  He doesn't -- didn't say what we wanted him
to say.  You heard him agree with much of what counsel
for Mr. Long was saying.  Yes, ma'am.  Yes, ma'am.
Yes, ma'am.  He agrees that that shoulder is related
to the accident.  He agrees that the ankle is related
to the accident.  He agrees with much of this
treatment for the accident.  He was quite reasonable.
He wasn't fighting them.  The only thing he disagreed
with was the causal relationship of that arthritis to
the accident.  And he says it's there the day of the
accident.  It had to predate, and it did not get worse
because of this accident.  Because you did not have
that interarticular injury.  He didn't have the injury
to the joint or to the bone.  You had soft tissue
injury.  That was the reason we went into that at such
length.

1        Next -- you can play that, please.

2        [PLAYING THE FOLLOWING VIDEO CLIP]

3        "MS. WINCHELL:  Doctor, regarding the

4   diagnostic films, July 2017 X-ray, August 2017 MRI,

5   the August 2018 X-ray, and the January 2019 X-ray,

6   what did those images tell you about Mr. Long's hip

7   and whether he -- he sustained an injury to his hip

8   joint that was caused by this subject accident?

9        DR. LYON:  There was no evidence of an injury

10  as a result of the motorcycle collision.  There is

11  arthritis.  And we know that arthritis pre-existed his

12  accident because there was not enough time to develop

13  arthritis after the accident before those first set of

14  X-rays, so he had an arthritic hip that did not become

15  painful until a year after the accident.

16       MS. WINCHELL:  Okay.  And if the injury to

17  his hip had made that degenerative condition

18  symptomatic as a result of the accident, would you

19  have expected that to show up immediately after the

20  accident?

21       DR. LYON:  I would at least expected him to

22  have complaints of his hip joint immediately after the

23  accident."

24       MR. MURNER:  Okay.  Let's go to the next

25  slide, please.  You can go ahead and play that,

1 please.

2       [PLAYING THE FOLLOWING VIDEO CLIP]

3       "MS. WINCHELL:  And does the fact -- "

4       MR. MENDIONDO:   Your Honor, may we approach?

5       THE COURT:  You may.

6       [CONFERENCE AT THE BENCH]

7       MR. MENDIONDO:  I'm going to try not to get

8 up again.  I'd just like to object to the playing of

9 witness testimony during the closing arguments.  I

10 mean, on my last transcript of the witness, we

11 couldn't read it to the jury.  That's improper to

12 remind them of his testimony.

13       THE COURT:  I am concerned about it.  Think

14 of it this way:  The jury has to rehear a witness

15 testimony.  We typically don't send it back so that

16 the jury can -- if they know that they've got a video

17 and they have requested to hear this witness --

18       MR. MURNER:  I've never had any problem

19 playing it, Your Honor, it's evidence.  They've herd

20 it so it's evidence.

21       THE COURT:  You're welcome -- yeah, you're

22 absolutely welcome to refer to it.  You're welcome to

23 talk about it.  You're welcome to argue all the

24 testimony, but it doesn't -- he doesn't get to testify

25 twice.

1    MR. MURNER:  Okay.

2    [IN OPEN COURT]

3    THE COURT:  You can continue.

4    MR. MURNER:  Thank you, Your Honor.

5    What Dr. Lyon testifies to here is he says a

6    soft tissue injury cannot cause or exacerbate the

7    arthritic injury.  That just doesn't happen.  That's

8    not within a reasonable degree of medical probability.

9    He also says if there was an injury to that

10    intra-articular joint, the ball and socket, such that

11    you'd have arthritis exacerbated or develop, that

12    would be indicated by pain on the date of the

13    accident.  Mr. Long would have been in pain at that

14    area.  That's not the case.  There is no evidence of

15    that.  And again, the MRI or X-rays that were taken

16    show there's no injury to the area.  There's no edema,

17    bone marrow edema, there's no soft tissue injury.

18    Next, please.  October 6, 2017.  This is

19    Dr. Gregory Grau, a Board certified orthopedic

20    surgeon.  He talks about the right shoulder doing well

21    and physical therapy helping that right shoulder,

22    which Dr. Lyon talked about how physical therapy is an

23    excellent modality to help with injuries such as this.

24    Mr. Long was happy with the results, and his main

25    complaint was right ankle.

1          Now, you'll see there's no suggestion of any

2     hip pain.  Dr. Grau is the person he would complain

3     about hip pain.  He's the orthopedic surgeon, the

4     Board certified orthopedic surgeon.  There is no

5     complaint about that.

6          Next, please.  Then we go to December 6.

7     This is Dr. Stearns, another Board certified

8     orthopedic surgeon, same as Dr. Lyon, same as

9     Dr. Clegg.  And this doctor says that his other

10    injuries, cervical strain, the rotator cuff tear, the

11    right shoulder arthritis and the contusion of the

12    right hip have all resolved.

13         Next, please.  Then January 3, Dr. Stearns,

14    again, Board certified, talks about that he's been

15    treated for the cervical strain, the right shoulder

16    injury, the hip pain with hematoma, right ankle pain

17    and stiffness, and basically the leg has healed.  He

18    was started on physical therapy, stretching and

19    strengthening of the ankle, and he responded well.  He

20    has few complaints.  He's quite satisfied with the

21    improvements he's made.

22         Then we go to February 6, 2018.  This is the

23    physical therapy discharge record.  Current

24    complaints:  No pain at baseline.  Baseline, that is

25    the term the physical therapists use and the doctors

use to show the date before he got injured.  That's
how you were before you got injured.

Then look at the level of functioning.
Premorbid status.  That means before you got injured.
This is what he's telling his physical therapist.
They're asking him these questions, What's your pain
level?  How's your activity level?  And he's giving
this to them.  They're not making this up.  They're
getting it straight from Mr. Long.  All goals were
met, and he was discharged at that time.  And when
they discharged you, they go through a list of things
you can do.  We put a few things up on the board here
just to emphasize a point, okay?

First one, satisfaction.  Very satisfied,
functional improvement, excellent.  He met all his
goals.  He's performing heavy activities -- or, I'm
sorry, he has a little bit of difficulty performing
heavy activities around his home, and he has no
difficulty getting in and out of his car, putting on
his shoes and socks.

Now, you heard Mr. Long and Theresa Long
testify that he can't put on his socks.  We're not
here to say that they're lying about that.  That may
be the case today.  That may be his degeneration from
this point in time, but on February 6, 2018, he is

telling the people who are working with him through
physical therapy, he is telling them that he is able
to do these things. They asked him the questions.
He's telling them. That is the time to tell them
about any problems you're having. He doesn't report
any.

Next, please. So what have we learned? What
have we seen to this point? Dr. Grau, Board certified
orthopedic surgeon, said give the wounds a chance to
heal, and they did. They gave them a chance to heal.
They waited on that ankle injury. They had to let
that ankle -- the skin heal. And then when they went
to physical therapy with that, that healed, too. The
shoulder healed, the hematoma went away, the ankle
healed.

Then we've got soft tissue versus bony
injury; Dr. Lyon discussed this. Again, soft tissue,
if you have a soft tissue injury, that's not going to
lead to the exacerbation of this arthritis that
they're suggesting on Mr. Long's side.

Now, sure, we saw these photos of the
bruises, the scrapes and the burns. You saw that the
bruises and scrapes healed with time, just like
Dr. Grau said they would. You saw the burns, they
healed, with the debridement. And that's not a

pleasant event.  We're not saying it was.  But it's
not simply going in there and having somebody scrape.
You do have lidocaine put on there.  But it healed
after months.  These are painful conditions, painful
treatment, and you need to compensate him for those.
You absolutely do.  But by February 2018, at the
latest, he's back to baseline with his pain level and
he's back to his premorbid functioning, back to
everything he could do before the accident.

          These are the professionals who are working
with him.  These are the objective findings based on
his subjective statements.  You combine the objective
testing, the findings, with the subjective statements.
Just like Dr. Clegg said, that's the story, objective
plus subjective equals the story.

          Mr. Long and his attorneys disagree with this
story.  They disagree with all these professionals who
said premorbid functioning, baseline pain.  They
disagree with all these tests that were taken that
show osteoarthritis was mild on the date of the
accident, and then in August 2018.

          So after 2 -- or after February 6, 2018, what
happens in Mr. Long's life?  Remember, he's released
from physical therapy.  He's released by Dr. Grau and
the orthopedics at Integrated.  He takes trips.  He

goes to Naples.  He takes that bike trip from Naples
down to Key West.  He goes to Lake Kissimmee with his
family.  He goes fishing there.  He buys a new
motorcycle.  He rides, like I said, Naples to Key
West, a long ride.  He gets a year-long fishing
license in Florida.  He takes a week-long motorcycle
trip to South Dakota, Wyoming, Colorado, seven days of
hard riding, hundreds of miles each day.  That's from
Sam.  Okay.  That's from February to August 2018.

Meanwhile, he's got this arthritic condition
that's developing in his body.

Next slide, please.  August 15, 2018.  This
is when he comes in, and this is the doctor's words,
not -- these are not our words, "Now he is complaining
of hip pain.  And on examination of the right hip,
they found limited range of motion and external
rotation.  They diagnose osteoarthritis of the hip, of
the knee and ankle tendinitis.  Limited range of
motion.  That's a new complaint.  New arthritic types
of complaints are seen here that did not exist back in
February when he was discharged from physical therapy
or before that back to the accident date.  And this is
important because Dr. Lyon addressed this.  The
shoulder injury, the shoulder had the tear.  That had
the subjective complaints, "I hurt," but it also had

the objective complaints of the tear.  The MRI saw the
rotator cuff tear.  Those two combined came up with
the diagnosis; the tear was caused by this accident.

Okay.  However, he went to physical therapy,
and it healed -- or it healed.  It resolved and it was
asymptomatic until later when it becomes symptomatic
again.  Dr. Lyon says, Well, those are the same
complaints, so it's all the same injury going back.
However, this arthritic problem is a new complaint.
These are totally new issues he's having from back in
the date of the accident.  That's why Dr. Lyon says,
This arthritis was always there and is just
developing.  The shoulder injury is the same because
it's the same complaints.  This is a totally new
injury.  Dr. Clegg disagrees with that.  He says that
this arthritis now was exacerbated by the accident.
And why does he say that?  Because the mechanism of
injury, the hard fall on the bike.  That's consistent
with having the shoulder problems, having hip
problems, having ankle problems, but he also says
because of the subjective complaints, what Mr. Long is
telling him.  Mr. Long told him, "I never hurt before.
I've hurt consistently from the accident date till
August 2019 and thereafter."  So Dr. Clegg says that
must be related.  It has to be related because he's

had consistent pain.  However, he agreed, Dr. Clegg
agreed there is no objective evidence showing the
significant change that he found.  He saw in the MRI
or X-ray, he saw that there was a significant change
that he felt in the development of the osteoarthritis.
But he agreed that there was no objective evidence
showing that this change that he thought he saw in the
arthritis was related to the motor vehicle accident.
He had no objective evidence.  He simply had
subjective complaints of pain.

Okay.  Next slide, please.  July 2019, right
hip pain with degenerative changes consistent with
osteoarthritis impingement and possible rotator cuff
tear.  Right ankle swelling and pain secondary to
trauma.

So now he's presenting back for follow-up
with the right hip pain.  Again, new complaints on the
hip pain.  Those complaints were never seen before
back in -- when the accident first happened up to
February 2018.

Then what they do is they send him to
American Imaging Consultants on 1-21-2020.  Again,
this is the consistency.  There is mild
osteoarthritis, mild narrowing of the right hip.  That
arthritis has not been exacerbating, has not been

getting worse.  It's the same degree.  Dr. Clegg wants
it to be a significant amount.  He wants to disagree
with the radiologist, with Dr. Grau, with Dr. Lyon,
but it's not consistent with the records.

Okay.  Ladies and gentlemen, we laid out this
timeline for you, and we've shown you what hurt and
when it hurt, what was resolved and when that was
resolved.  It's now in your hands what caused the
2018 -- I'm sorry -- the August 2018 osteoarthritic
pain.  That's your -- that's your decision.  Upon that
decision, springs a lot of other answers to questions
you're going to have in these jury instructions.  That
answer to that question leads to the issue of future
pain and suffering and future medical treatment.  What
caused that condition in August of 2018, when he went
back for hip pain?  Was it this accident, or was it
the aging process?  We submit to you that it was the
aging process.  And the records of information, the
tools that you have to use to decide that show that it
was the aging process.

What other evidence are you going to have
when you go back in that jury room to decide whether
it was aging or whether it was something from the
motor vehicle accident?  You've going to have the
testimony from Sam about what he's been doing.

Let's go back, please.  These are activities of daily living.  Okay.  These can be used -- this evidence can be used not only to decide if the arthritis is related, but it can also be used to decide the level of functioning, and thus, his pain and suffering currently and in the future.  Okay? That's why we present these things to you.  We're not -- we are not criticizing him for going on vacation, buying a new motorcycle, having all these great toys, you know, adult toys down there, the -- you know, the jet ski, the pontoon boat, going down to the lake.  That's great; that's absolutely wonderful, but it's got to be consistent.  If you're claiming that life is upended for you here, it's got to be consistent, and that's why we have to present the whole case to you, all the information to you so you have that in front of you, as opposed to simply just guessing what's he doing now.  How's he doing now? You have information from -- directly from these witnesses as to how he's doing.  He's going to Lake Cumberland every other week.  He's got motorcycle rides when he's at home, 100 to 200 miles on days that he goes riding.  He's fishing, no problem.  He's able to perform housework, and he mows his lawn with the zero turn mower.

1    Next, please.  We talked about Naples, Key
2    West, Lake Kissimmee.  We talked about the motorcycle
3    trip where he rode a full dressed touring motorcycle
4    from Kentucky to South Dakota, Wyoming, Colorado, and
5    then home.
6    Next, please.  He did The Tail of the Dragon.
7    Think about that.  That is -- I forget how many miles
8    with all the curves.  318 curves in 11 miles.  That's
9    a lot of movement on your body with that heavy bike.
10   He was able to do that.  He was able to do that after
11   he was discharged from physical therapy with the
12   premorbid level of functioning, with a back to
13   baseline with this pain.  He was able to do all those
14   things.
15   Gatlinburg family reunions, he was able to do
16   that.  Not criticizing him in the least, but it's
17   outstanding that he can do those things.  That goes
18   into your tool kit that you take back with you when
19   you decide what caused the accident or what caused the
20   arthritis in the hip and what's his level of
21   functioning now to decide his pain and suffering.
22   Okay.  Here are some other trips and
23   vacations that he's taken, Daytona, Lake Worth,
24   Arkansas motorcycle trip, Myrtle Beach.
25   Next, please.  He's going in daily to work.

Now he's working the register.  He's got some help

from his stepson, but he's able to drive delivery

pick-ups -- deliveries and pick-ups.  He operates a

skid loader, and he cleans the corn auger.

Again, God bless him.  That's outstanding.

That's outstanding.  We're just trying to show you the

full picture of Sam Long.  What is he doing currently?

Okay.  Now, let's talk about the jury

instructions.  The Judge will instruct you on the law,

and you must follow those instructions on the law.

What we say here is not evidence.  What I've told you,

talked to you about, what Mr. Mendiondo has talked to

you about is not evidence, okay?  We are simply

suggesting to you what the evidence we've presented to

you shows.

The first instruction talks about your duty

to follow the law.  Absolutely, that's -- let that

guide you in all other things -- in all things, and

you cannot go wrong.

You must perform your duties as jurors

without bias or prejudice as to any party.  The law

does not permit you to be controlled by sympathy,

prejudice or public opinion because we want you to

look at the evidence.  We want you to study the

evidence and make your ruling based on the evidence.

Now, you're allowed -- or we ask you to check a lot of things at the door. Okay. Check your biases, check your cellphones, check all these things, all your life experiences a lot of times. We ask you don't let that influence your decision, check it at the door. One thing we don't ask you to check at the door is your common sense. That is the most important tool you have in the tool bag, your common sense. You can look at these records and you can decide, are his complaints, is his $1.5 million demand for pain and suffering consistent with what's been going on in his life, and what else is going on -- or will happen in his life? Common sense. Please, use your common sense.

Credibility of witnesses. I've talked to you about Dr. Lyon. They suggest bias due to his -- that we're paying him. But remember, Dr. Clegg does the exact same thing. He does IMEs. He's stated he does IMEs. He charges. He charges for his time. He meets with the attorneys. He does the exact same thing.

Dr. Lyon, I will suggest to you, was incredibly reasonable and fair in his testimony because he was agreeing with most of what counsel was saying. There was just one small area that we disagree.

Opinion testimony.  This is Dr. Travis --
Dr. Clegg, Dr. Caryn Nicol, and Dr. Rick Lyon.  Assess
Dr. Lyon's testimony again.  He was reasonable.  He's
giving them all these damages.  He's saying these
things are related.  I'm not arguing with you.
There's nothing to argue there.  We could have gone
and said we're not using Dr. Lyon.  Let's go find
another doctor.  And that discussion about we can't
talk to doctors, that's absolutely correct, as
Mr. Mendiondo said.  We can't go to physicians and
find what's beyond the records.  What else is there?
We have to rely on their physicians testifying, or we
have to go get somebody else to do a records review to
review these things and tell us their professional
opinion, and then maybe do an examination and come and
testify.  Again, Dr. Clegg does the same thing.

There's a section here the Judge is going to
instruct you on in damages and proof.  And the
damages, as Mr. Mendiondo discussed, means the amount
of money that will reasonably and fairly compensate
the plaintiff for any injury you find was caused by
the defendant, not enrichment, not cutting it short.
It's what's reasonable and fair.  That's solely up to
you.  But that decision on what's reasonable and fair
must be based on the evidence.  The burden of proof

was discussed.  Another way of thinking of
preponderance of evidence is more likely than not.  Is
it more likely than not that this happened or that
that happened?

Compensatory damages.  Again, this
compensatory damages are to compensate for what was
lost, make whole.  Okay.  I had to pay this much in
medical expenses, it's related to the accident,
therefore, we pay that much to compensate you and make
you whole.  Again, that must be based on the evidence.

I want to go -- finish up here talking about
the jury verdict form at the end.  There are elements
of damages that Mr. Mendiondo went through with you.
First one was medical expenses.  That's pretty easy.
Again, your work's been done for you in that regard
except for a little discrepancy or a disagreement
between the treatment and diagnosis.  That's where you
can decide.

Next is medical expenses that are reasonably
likely to incur in the future as the direct result of
the subject collision, and it's not less than
$30,414.08, not more than $117,821.33.

Okay.  This is it pretty much, except there
are some other areas where you saw when Beth was
questioning Caryn Nicol.  You saw that she was saying,

"Well, I'm guessing, I'm speculating on that."  There
are things she prescribed in her -- or she stated in
her list of future medical expenses.  She can't
prescribe those.  She can't order those things, and
the doctors never testified to those things.  She's
just basically taking what Dr. Clegg said he needs,
his surgery, needs that surgery, and she just put
together a shopping cart, if you will, of things she
thinks are needed.  She can never prescribe this,
could never order those.  And many of those things are
speculation, as she said.  If this happens, then he'll
need it.  Well, you can't go on speculation.  You
gotta go on what is the evidence, okay?  What is more
likely than not to happen.

Physical, mental and emotional pain and
suffering.  This one I think I would submit to you and
suggest to you that you start off with that decision,
is the hip related to this accident, and decide how
much of his current and future -- his past and future
pain and suffering is related to the hip.  Because
remember the testimony from Dr. Clegg and from
Dr. Lyon.  If he gets -- if you find that the hip's
not related, that's an easy decision, okay?  All the
treatment, all the pain and suffering related to the
hip after the subject accident as you were -- all the

pain and suffering that is related to this hip is not compensable, okay, other than the bruise and the road rash.

So if you find it's not related, again, that makes your decision easier.

If you find that it is related, that the hip is related, remember what the testimony was. The surgery has a 95 percent chance of relieving that pain, zero free -- or zero pain, as Dr. Clegg said. Okay. So if you're finding the hip related, the surgery that's been recommended for months is going to relieve that pain in the future. With that pain being relieved, Dr. Clegg also said the knee pain's going to be relieved. Dr. Lyon said the knee pain's going to be relieved. So that is something you take into consideration.

Okay. Ladies and gentlemen, I've worn out my welcome long ago, but again, I want to thank you for your time and effort and consideration. What I want you to take back with you again is your common sense and a thorough review of these records. I want you to take these records, look at them and think of this timeline we told you about and see if there's a causal relationship between that accident and the hip pain that he's complaining about in August 2018. We submit

that the evidence is not consistent with that both

what he's doing with activities of daily living, what

the medical records say, what he's telling his

treaters, it's not consistent, and, therefore, we

submit to you that you should find so in your jury

instructions.  Thank you very much.

THE COURT:  Thank you.  Mr. Mendiondo.

MR. MENDIONDO:  Thank you, Your Honor.

Mr. Murner.

MR. MURNER:  Mr. Mendiondo.

MR. MENDIONDO:  Ladies and gentlemen.  What

won't go away?  Let's just take everything Mr. Murner

said is true for just a few minutes, what won't go

away, will never get fixed?  The swelling of the leg,

that vascular injury, the clot, whatever we call --

whatever is causing it, that will never go away.  The

pain in the ankle that was crushed, that was smooshed,

that he's going to live with for the rest of his life,

that will never go away.

In 20 years he'll be dealing with the same

pain then he's dealing with now, making the same

decisions then, he's dealing with now about how to

deal with that.  That won't go away.

What else won't go away?  Well, the shoulder

pain will hopefully go away once he has the surgery,

but he's going to have to have the surgery.  He's
going to have to go through that, go through another
rehabilitation after he went through that long
six-month rehabilitation after the collision in the
first place.  So he's still going to have to do that.
That will get fixed.

The stuff he went through today is never
going to go away.  Everything he's gone through up
until this point, living through this wreck,
recovering, won't go away.  Everybody agrees to that.
That's still out there.

And then the hip.  I mean, that's really the
fight, right, the medical fight?  Again, most of the
time we've spent, what about this hip?  There's a
couple things I want to hit on that.  You know, it's
interesting and insisting that all these medical
records show there aren't any arthritic problems in
the hip were all taken in that time period when he
wasn't having arthritic problems in the hip, August
2017, October 2017, November 2017, January 2018.  All
these times when he's experiencing the pain from the
collision, from the hematoma, from the bruising had
yet caused this to become so bad that it got disabled
that he had to go to the doctor.  Dr. Clegg didn't say
he got Jobed, and all of a sudden he had arthritis.

He said it took him a year to heal, and as he healed,
this got worse, and that's what happened.  That's why
his right hip got bad and his left hip stayed the
same.  Same body, same motorcycle rides, same fishing,
same Sligo Feed Mill.  One stayed fine and one got
worse because this one got smooshed and that one
didn't.

If there's one thing Mr. Murner and I are
going to agree on is that common sense rules the day.
And what you've got right here is a case of common
sense versus coincidence.

Dr. Clegg has explained why common sense and
the difference between the X-rays, the objective
X-rays show that this hip injury where he is today was
aroused by this collision.  Common sense says the only
difference between the right hip and the left is this
collision.  But Dr. Lyon came in and says, "Ah, it's
not."

I have never seen an attorney so skillfully
say, We're not criticizing him but, but he really did
go on these trips.  But he is still fishing.  But he
bought a new motorcycle.  But he rides hundreds of
miles a day, which isn't at all the testimony that he
gave on the witness stand.

Now, my statement's not testimony, and what

1  he writes in bullet points on this presentation isn't

2  testimony.  I hope that you were paying attention and

3  taking notes when Sam explained what he really does

4  do.  He does the things he used to do the best he can

5  'cause that's who he is and that's what he's going to

6  do.  He doesn't do any of them like he did before.

7  And that's what the law requires you consider.  That's

8  what you're supposed to fairly determine the value of.

9        If he could have it all back, how you make an

10  award that's fair that puts him in that same place.

11        Thank you, ladies and gentlemen.

12        [This concludes the closing arguments of the

13  parties.]

14

15

16

17

18

19

20

21

22

23

24

25

1          [RECESS – 3:19 – 5:37 p.m.]

2          [IN OPEN COURT]

3          THE COURT:  All right.  We've convened

4    outside of the presence of the jury.

5          I have received a note saying that, "We have

6    a verdict."

7          So in a moment we'll have the jury brought

8    back in, and we'll publish the verdict.

9          We do not allow any demonstrative response to

10   the verdict by the lawyers or anybody here in court

11   out of respect for the jury.

12          And with that, we'll have the jury brought

13   back into the courtroom.

14          [JURY ENTERS COURTROOM]

15          THE COURT:  All right.  You can be seated.

16   The jury has returned to the courtroom.

17          Ladies and gentlemen, you'll recall that in

18   my instructions I directed you to choose a foreperson.

19   Could that person stand and be recognized, please.

20          FOREPERSON:  Yes, Your Honor.

21          THE COURT:  Yes, sir.  Has the jury reached a

22   unanimous verdict?

23          FOREPERSON:  Yes, we have.

24          THE COURT:  Okay.  If you'll give that

25   verdict form to the court security officer, please.

Thank you, sir.

All right.  I'm going to have the verdict published, which simply means it's going to be read out loud.  Listen carefully, make sure that the verdict published is in fact your verdict.

So, Madam Clerk, when you're ready.

COURTROOM DEPUTY:  Thank you, Your Honor.

We, the jury on our oaths present our answers to questions submitted by the Court to which we have all agreed.

You will now determine from the evidence and award Samuel Long a sum of money that will fairly and reasonably compensate him for such of the following damages as you believe from the evidence that he sustained solely by reason of the injuries caused by this collision:

A.  Medical expenses that he has incurred as a direct result of the subject collision in the amount of $35,639.55.

B.  Medical expenses that he's reasonably likely to incur in the future as a direct result of the subject collision in the amount of $80,144.64.

And C. Physical, mental and emotional pain and suffering and disability or loss from normal life that he has incurred in the past and/or present, or is

reasonably likely to incur in the future as a direct
result of the subject collision, $575,000.00.  For a
total of $690,784.19.

THE COURT:  All right.  Counsel, would
anybody like to have the jury polled?

MR. MENDIONDO:  Not for the plaintiff, Your
Honor.  Thank you.

MS. WINCHELL:  No, Your Honor.

THE COURT:  Well, Ladies and Gentlemen of the
Jury, let me make you aware of a local rule.  It's
Local Rule 47.1, and here's what it says:  It says,
"Unless permitted by the Court, no party or attorney
or a representative of a party or attorney may
contact, interview or communicate with any juror
before, during, or after the trial."

So you're going to be free to talk about the
case as you choose, but nobody, consistent with that
rule, can contact you to discuss the case.

If you chose to take notes, please leave
those here.  We'll shred those.  We keep no record of
any notes that you've made, and we'll make sure that
those are destroyed.

Is there any objection from counsel to
finally releasing this jury from any further service?

MR. MENDIONDO:  No, Your Honor.  Thank you.

1          MS. WINCHELL:  No, Your Honor.

2          THE COURT:  Ladies and gentlemen, with the

3    appreciation of all of us, you're finally dismissed

4    from any further service in this case.  Thank you very

5    much for appearing.

6          And at this time, the jury can exit the

7    courtroom.

8          [JURY EXITS COURTROOM]

9          THE COURT:  All right.  You can be seated.

10          My practice, Counsel, is to thank each juror

11    for their participation.  I'll do that in a moment.

12    We never, of course, talk about the case.

13          But let me see if there are any post-verdict

14    matters I need to take under consideration for the

15    plaintiff.

16          MR. MENDIONDO:  There are no motions from the

17    plaintiff, Your Honor.

18          THE COURT:  Okay.  And any post-verdict

19    matters I need to consider for the defense?

20          MS. WINCHELL:  No, Your Honor, other than the

21    post-verdict reduction for the PIPs to which the

22    parties stipulated in the amount of $10,000.

23          THE COURT:  So why don't I direct the parties

24    to tender a proposed judgment in the case, take a look

25    at the verdict, and then consider, of course, the

granting of the motion with regard to the insurance

matter, and then we'll make sure that the correct

judgment is entered in the case.

　　　　All right.  Well, thank you, Counsel.

　　　　I would like to just thank you for your

service in a few minutes.  Nobody wants to wait around

late in the day like this, but I'll meet with the

jury, and then greet counsel briefly as well.

　　　　This case is finally adjourned.

　　　　[END OF PROCEEDINGS – 5:43 p.m.]

　　　　　　　　* * * * *

　　　　　C E R T I F I C A T E

　　　　I, SANDRA L. WILDER, RMR, CRR, certify that

the foregoing is a correct transcript from the record

of proceedings in the above-entitled matter.

/s/ Sandra L. Wilder RMR, CRR　　Date of Certification:
Official Court Reporter　　　　　September 2, 2021